[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On June 9, 1999, the plaintiff, Elizabeth Schlett[1], filed an application for prejudgment remedy against the defendant, Stephen Baker. Specifically, plaintiff seeks to attach sufficient property of the defendant to secure a set sum, in particular, his CT Page 378 interest in real property known as 283 Highland Avenue, Wallingford, Connecticut, in the amount of $250,000.
The plaintiff is a thirty-eight-year-old woman who has been married for fourteen years and has four children ages twelve, ten, six, and two. In March 1980, the plaintiff began attending Heritage Baptist Church at age nineteen. There she met the defendant, Stephen Baker, the pastor of the church. During this period, the plaintiffs parents were divorced and her father was not involved in her life. Moreover, the defendant became a "father figure" to the plaintiff and she became emotionally dependent on him for advice.
The defendant assisted the plaintiff in choosing to attend Marinaptha Baptist Bible College in Watertown, Wisconsin. Following bible college in June 1982, the plaintiff returned to Connecticut and became his secretary. The defendant subsequently expressed a personal interest in the plaintiff. At one point the plaintiff told the defendant that she loved him. Further, the plaintiff testified that "knowing that he approved and that he was happy with what I was doing was extremely important to me." The plaintiff and her husband pledged $10,000 to the church although they barely had enough money to pay rent. In order to satisfy the pledge, the plaintiff worked for the church without pay. After some time, the plaintiff told the defendant she would have to be paid or seek work elsewhere. The defendant stated he could figure out a way to give her a paycheck and then said, "[h]ow about a hug for your pastor." The plaintiff claimed she was surprised but leaned across the desk and gave him a hug.
In 1991, while the plaintiff was working for the church, the defendant started making sexual advances towards her. The defendant would put his arms around the plaintiff and stand close to her at the filing cabinet. The plaintiff indicated at this point she had an emotional connection to the defendant and needed his approval desperately. The plaintiff testified about how she felt regarding the defendant's physical overtures: "[w]ell, at that point in time I was glad that he wanted my attention, I guess." In June, 1991, the defendant kissed the plaintiff. On cross examination, she admitted that she drove herself to the defendant's house where the kiss took place.
When the plaintiff informed her husband of the kiss, her husband was angry. After they moved to Texas the plaintiff continued to talk and write to the defendant. Testimony by the CT Page 379 plaintiffs husband indicated that the plaintiff considered herself partially responsible for the defendant's actions. This testimony was corroborated by Mr. Pinto, a church maintenance worker and Spanish pastor, who testified that the plaintiff told him she was partially responsible for the relationship between her and the pastor. The plaintiff also told Mr. Sassi, a member of the Heritage Baptist Church school board, that "she knew what she had done was wrong, that she was partially responsible for it."
In 1992, the plaintiff and her husband returned to Connecticut after approximately four months in Texas. The plaintiff returned to work at the church without seeking employment elsewhere. At this time, the plaintiff was earning about $150 per week and two of her children were attending the church school tuition free. After her return from Texas, the defendant would ask the plaintiff if he could look down her shirt. The requests initially occurred once a week, then with increasing frequency. The plaintiff claims, initially, she was abhorred, but eventually submitted because she wanted to please the defendant.
Also, in 1992, the defendant requested that the plaintiff remove her bra. These sexual advances escalated to the point where the defendant wanted to see the plaintiff totally undressed. Although the plaintiff resisted these requests, the defendant was persistent, and eventually she submitted. At the defendant's request, she took off her underclothes, including underwear. The defendant came into the office, lifted her dress and looked up her skirt. Some of these sexual overtures occurred in the office of the defendant's wife who also worked at the church, located in the basement of the church.
On one occasion in the summer, at the defendant's request, the plaintiff entered the ladies room and removed her bra. She returned to the basement office where the defendant unzipped her dress and pulled it up over her shoulders so she was nude from the waist up. The plaintiff was embarrassed and covered herself with her arms. The defendant physically removed the plaintiff's arms from her chest in order to look at her breasts. The plaintiff also testified that defendant removed his belt, lowering his zipper and exposed himself to the plaintiff. The plaintiff testified that on at least 70 occasions she denied the defendant's requests to see her breasts while submitting only 15 times. The defendant continued the sexual advances with the plaintiff up to and including the time the plaintiff left the CT Page 380 church in June 1997.
Testimony revealed that the plaintiff had taken advances in her salary in the amount of $3,000, which she intended to work off before she left her employment. The plaintiff claims she informed her gynecologist, Dr. Tropan about the relationship. She also spoke to her regular doctor, Dr. Bertz about the relationship and was placed on Paxil, an anti-depressant. Since 1998 the plaintiff claims she has been continuously taking anti-depressants.
The plaintiffs claimed damages include $100,000 for loss of income and $100,000 for emotional distress. She further claims the tuition for the children was worth about $125,000 and she would like to be able to get counseling. Medical records introduced by the plaintiff indicate her total medical expenses were $187 for the period of January 7, 1998 to January 31, 1999. (Plaintiff's Exhibits 2 and 3.) The plaintiff testified that after she left the church in July 1997, she worked for a job placement company: as a babysitter, and as a crossing guard. The plaintiff claims she has found it difficult to work in an office with men because she feels uncomfortable.
At the hearing the defendant offered the following testimony: the plaintiff and the defendant were both adult, married, and had their own families at the time the inappropriate relationship which started in the early 1990's. The defendant admits he had an improper physical relationship with the plaintiff because he was married. The plaintiff worked as a secretary and receptionist, school secretary and bookkeeper. The defendant claims that he was not counseling the plaintiff other than he discussed college, financial matters, and family.
He testified that he kissed her a total of three times, and hugged her seven or eight times from 1991 to 1997. Further, the defendant claims he saw her partially undressed eight to ten times. The defendant testified that he never saw her fully undressed and that he never saw her genitalia. The plaintiff never refused when he asked to see her undressed. The plaintiff drove herself to the defendant's home for the purpose of ending the relationship. There the plaintiff and the defendant kissed and they decided the relationship should be ended. The plaintiff told the defendant that she loved him on several occasions. The plaintiff testified that we talked about that we cared for each other, but that we couldn't continue down this road because it was unhealthy for both of us." In 1997 the plaintiff showed an CT Page 381 interest again in continuing the relationship and the defendant did not desire to continue it.
The defendant admits he pulled up her skirt on two occasions, one in 1991 at his house, and on another occasion in the downstairs offices of the church. The defendant admits he exposed his genitals to the plaintiff one time in 1991 in the office located in the church basement. He never asked her to show her breasts after the birth of her last child. When the plaintiff would come to the defendant's office the door was not always closed. The plaintiff testified that she sometimes left the door open The defendant testified that the last time he asked the plaintiff to expose herself from the waist up was in the fall of 1996. He further testified that the relationship ended in 1997. The defendant testified that he resigned from the church but they never asked for his resignation.
"Section 52-278d of the General Statutes requires that the hearing be limited to a determination of whether or not there is probable cause to sustain the validity of the plaintiffs claim. Because [t]he adjudication made by the court on the application for a prejudgment remedy is not part of the proceedings ultimately to decide the validity and merits of the plaintiffs cause of action . . . the plaintiff need not establish by a preponderance of the evidence the final merit of his claim, but only its probable validity." (Citations omitted; internal quotation marks omitted.)
"In undertaking the probable cause analysis that our present [prejudgment remedy] statute requires, a court is required to consider not only the validity of the plaintiffs claim but also the amount that is being sought." Union Trust Co. v. Heggelund,219 Conn. 620, 625, 594 A.2d 464 (1991).
A valid defense may defeat probable cause. Roberts v. Caton,224 Conn. 483, 487 n. 4, 619 A.2d 844 (1993). At a prejudgment remedy hearing the court must consider all defenses because a "good defense, such as infancy or the running of the statute of limitations, will be enough to show that there is no probable cause that judgment will be rendered in the matter in favor of the plaintiff." Augeri v. C.F. Wooding Co., supra, 173 Conn. 429.
 STATUTE OF LIMITATIONS AS FIRST DEFENSE
A. Intentional Infliction of Emotional Distress and Assault andCT Page 382 Battery (First and Second Counts)
General Statutes § 52-577 provides "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of." The filing of a prejudgment remedy application does not commence an action.Howard v. Robertson, 27 Conn. App. 621, 626, 608 A.2d 711 (1992) (holding that the language of General Statutes § 52-278c (b), that the plaintiff is "about to commence an action," plainly indicates that the application for prejudgment remedy, together with documents that accompany it, do not commence an action); General Statutes § 52-45a; Raynor v. Hickock Realty Corp.,
Superior Court, judicial district of Litchfield, Docket No. 073726 (May 4, 1999 Dipentima, J.) (24 Conn. L. Rptr. 446). "It is well settled that an action is brought on the date on which the writ is served on a defendant." Hillman v. Greenwich,217 Conn. 520, 527, 587 A.2d 99 (1991); Lacasse v. Burns,214 Conn. 464, 475, 572 A.2d 357 (1990); Seaboard Burner Corporation v.Delong, 145 Conn. 300, 303, 141 A.2d 642 (1958).
The defendant argues that the statute of limitation to be applied to tort claims is three years. Further, that the plaintiff has not yet commenced her action so that it is entirely speculative as to when the claims will be precluded. The defendant argues that if the plaintiff commences this action in January 2000, her claims for intentional infliction of emotional distress and assault and battery (First and Second Counts) will be time barred for all alleged acts occurring prior to January 1997. The plaintiff has not addressed the issue of statute of limitations for her claim of intentional infliction of emotional distress or assault and battery[2]. Further, the plaintiff has not raised any claims of tolling or fraudulent concealment regarding the statute of limitations.
In the present case, testimony indicates that the majority of alleged incidents of inappropriate conduct occurred prior to January 1997. Assuming that the plaintiff commences her action in January 2000, all claims for intentional infliction of emotional distress and assault and battery alleged to have occurred prior to January 1997 will be time-barred under General Statute § 52-577.
B. Negligent Infliction of Emotional Distress (Third Count)
Connecticut General Statutes § 52-584 provides in relevant part, "No action to recover damages for injury to the person, or CT Page 383 to real or personal property, caused by negligence, or by reckless or wanton misconduct . . . shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered. . . ."
The defendant argues that assuming the present action is commenced in January 2000, all acts alleged to have occurred prior to January 1998 will not support a finding in plaintiffs favor. Further, the plaintiff left her job at the church in June 1997 and after July 1997 she had no further contact with the defendant. The defendant argues that the plaintiff had to commence her negligence action by June or July 1999 to meet General Statutes § 52-584 in order to survive a motion for summary judgment based on the statute of limitations. Moreover, the plaintiff concedes in her post hearing brief that the negligent infliction of emotional distress claim is effectively time-barred under the two-year statute of limitations and she has abandoned that claim. The plaintiffs claim of negligent infliction of emotional distress is time-barred by General Statutes § 52-584.
C. Breach of Fiduciary Duty (Fourth Count)
Actions sounding in breach of trust or breach of fiduciary duty are governed by § 52-577 of the General Statutes. Lambert v.Stovall, 205 Conn. 1, 4, 529 A.2d 710 (1987). Under General Statutes § 52-577, "[no] action founded upon a tort shall be brought but within three years from the date of the act or omission complained of." "Section 52-577 is an occurrence statute, meaning that the time period within which a plaintiff must commence an action begins with the date of the act or omission complained of, not the date when the plaintiff first discovers an injury." (Internal quotation marks omitted.) Collumv. Chapin, 40 Conn. App. 449, 451, 671 A.2d 1329 (1996), citingS.M.S. Textile Mills, Inc. v. Brown, Jacobson, Tillinghast, Lahan King, P.C., 32 Conn. App. 786, 790, 631 A.2d 340, cert. denied,228 Conn. 903, 634 A.2d 296 (1993).
The defendant argues that the plaintiffs claim of breach of fiduciary duty, assuming arguendo that the action is commenced in January 2000, will be time-barred for alleged acts that occurred prior to January 1997. The plaintiffs post hearing brief is silent regarding the issue of the three year statute of limitations barring claims for breach of fiduciary duty. CT Page 384
In the present case, testimony indicates that the majority of alleged incidents of inappropriate conduct occurred prior to January 1997. Assuming the plaintiff commences her action in January 2000, all claims for breach of fiduciary duty alleged to have occurred prior to January 1997 will be time-barred under General Statute § 52-577.
PROBABLE CAUSE
A. Intentional Infliction of Emotional Distress (First Count)
To establish a cause of action for intentional infliction of emotional distress, "[i]t must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiffs distress; and (4) that the emotional distress sustained by the plaintiff was severe." (Internal quotation marks omitted.)Parsons v. United Technologies Corp., 243 Conn. 66, 101,700 A.2d 655 (1997); Petyan v. Ellis, 200 Conn. 243,253, 510 A.2d 1337(1986).
"Extreme and outrageous conduct is an essential element in the tort of intentional infliction of emotional distress. Mere insults, indignities, or annoyances that are not extreme or outrageous will not suffice." Brown v. Ellis, 40 Conn. Sup. 165,167, 484 A.2d 944 (1984); Biro v. Hirsch, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 314442 (February 5, 1998, Skolnick, J.).
"Liability for intentional infliction of emotional distress requires conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind. Thus, [i]t is the intent to cause injury that is the gravamen of the tort."Bell v. Board of Education, 55 Conn. App. 400, 409 ___ A.2d ___ (1999). "Whether the defendant's conduct and the plaintiffs resulting distress are sufficient to satisfy . . . these elements is a question, in the first instance, for [the] court. Only where reasonable minds can differ does it become an issue for the jury." Id., 409-10. CT Page 385
The plaintiff argues that based on the evidence produced at the hearing, there is no doubt that the plaintiff has met her minimal burden of establishing probable cause on this claim. The plaintiff further argues that the plaintiffs age and emotional distress when she began counseling with the defendant, the fact that the defendant was her pastor, her emotional dependance, repeated unwanted sexual contact initiated by the defendant and plaintiffs medical and psychiatric care, all combine to satisfy her burden of proof on this claim.
The defendant, however, cites Teadt v. St. John's EvangelicalChurch, 1999 WL 7313833 (Mich.App. 1999) (___ N.W.2d ___)[3], as persuasive authority for the proposition that the plaintiffs claim of intentional infliction of emotional distress is insufficient as a matter of law.
Analyzing the plaintiff's claim of intentional infliction of emotional distress, the court in Teadt v. St. John's EvangelicalChurch, supra, held that, "[s]tripped of religious overtones, plaintiff essentially alleges that a person pursued her, an adult woman, gained her trust, and eventually engaged in a consensual relationship with her, albeit that her consent was given when she was in a vulnerable position. This type of activity does not rise to the level of conduct necessary to satisfy the standard articulated in [Doe v. Mills, 212 Mich. App. 73, 91,536 N.W.2d 824 (1995)].[4] Because defendant's conduct could not be reasonably regarded as extreme and outrageous, plaintiff has failed to state a claim upon which relief may be granted and summary disposition was appropriate." Teadt v. St. John's Evangelical Church, supra.
In the present case, the plaintiff and the defendant were both adults, married and had their own families at the time of the inappropriate relationship that started in the early 1990's. Testimony was introduced regarding the plaintiffs feelings about the defendant's physical overtures toward her. The plaintiff responded, "[w]ell, at that point in time I was glad that he wanted my attention, I guess." Testimony also indicated that many of the defendant's requests for exposure were made to her in his office. The plaintiff testified that she often closed the office door during these requests but there were other times when the door would remain open. The plaintiff also testified that she drove herself to the defendant's house where an incident involving a kiss occurred in the early 1990's.
The court concludes the plaintiff has failed to demonstrate CT Page 386 probable cause to sustain the validity of this cause of action, of intentional infliction of emotional distress.
B. Assault and Battery (Second Count)
"An assault has been defined as any attempt with force or violence to do corporal offense to another, coupled with the present apparent ability to complete the act. . . . A battery is a completed assault." (Citation omitted.) Singer v. Stammel,
Superior Court, judicial district of Danbury, Docket Number 967530 (May 28, 1997, Grogins, J.). "An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other . . . or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." Altieri v. Colasso, 168 Conn. 329, 336 n. 3,362 A.2d 798 (1975). "An actionable assault and battery may be one committed willfully or voluntarily, and therefore intentionally, or one done under circumstances showing a reckless disregard of consequences; it may also be one committed negligently." Krause v. Bridgeport Hospital, 169 Conn. 1, 8,362 A.2d 802 (1975).
Normally, consent is a defense to an intentional tort. Seebeckv. McLaughlin Research Corporation, Superior Court, judicial district of New London at New London, Docket No. 530884 (April 2, 1996, Austin, J.); see, e.g., D. Wright, J. Fitzgerald W. Ankerman, Connecticut Law of Torts, § 15 (3rd Ed. 1991). "The consent of the person will ordinarily avoid liability for intentional interference with person or property. It is not strictly speaking, a privilege, or even a defense, but goes to negative the existence of any tort in the first instance." Khouriv. Koloniaris, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 330880 (February 7, 1997, Melville, J.) citing W. Prosser W. Keeton, Torts, § 18 p. 112 (5th Ed. 1984).
The plaintiff argues that given the evidence of unwanted touching and offensive conduct by the defendant, the plaintiff has established probable cause with respect to the assault and battery count of the proposed complaint. The defendant argues that consent is his primary factual defense because the plaintiff was a willing participant in all aspects of the parties' relationship. Further that the plaintiffs testimony indicates that a consent defense will likely prevail. CT Page 387
The defendant introduced testimony suggesting that the contact was consensual. The defendant testified that the plaintiff told him she loved him on several occasions.
The plaintiff has not established a bonafide belief in the existence of facts essential under the law for a claim of assault and battery as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it in this case. Applications under First and Second Count denied.
C. Breach of Fiduciary Duty (Fourth Count)
"[A] fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." KonoverDevelopment Corp. v. Zeller, 228 Conn. 206, 219, 635 A.2d 798
(1994). "Professional negligence implicates a duty of care, while breach of a fiduciary duty implicates a duty of loyalty and honesty." Beverly Hills Concepts, Inc. v. Schatz and Schatz,247 Conn. 48, 56, 717 A.2d 724 (1998), citing Edwards v. Thorpe,
876F. Supp. 693, 694 (E.D. Pa. 1995); Bukoskey v. Walter W.Shuham, 666 F. Sup. 181, 184 (D. Alaska 1987).
The Connecticut Supreme Court has not specifically recognized a cause of action for breach of fiduciary duty in the priest-penitent context.[5] The plaintiff, however, cites to Martinelli v. BridgeportRoman Catholic Diocesan Corp., 196 F.3d 409, 10 F. Sup.2d 138 (D. Conn. 1998), aff'd in part and rev'd in part ___ F.3d ___ 1999 WL 1041457 (2nd Cir. November 10, 1999), as the leading Connecticut case on the issue of breach of fiduciary duty in the priest-penitent context. The defendant argues that the plaintiff erroneously cites Martinelli v.Bridgeport Roman Catholic Diocesan Corp., supra, 196 F.3d 409, for the proposition that a fiduciary relationship can be found to exist in this case.
In the present case, the plaintiff and the defendant were both adults and married to third parties during the inappropriate relationship. Martinelli v. Bridgeport Roman Catholic DiocesanCorp., supra, 196 F.3d 409, is distinguishable from the present case, because it involved the breach of fiduciary duty of a minor child who entrusted his teachings and moral authority to the Diocese. Further, because of the apparent consensual nature of the relationship of the parties, the present case does not CT Page 388 involve a "justifiable trust confided on one side" and a "resulting superiority and influence" on the other. The Court declines to read specific requirements for a fiduciary relationship in the priest-penitent context into Connecticut law in this case at this time. Moreover, the plaintiff has failed to establish probable cause that judgment will be rendered in her favor as to the Fourth Count. Accordingly, application for prejudgment remedy on all counts of the proposed complaint is denied.
Frank S. Meadow, Judge Trial Referee